```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/6/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                          :

DOROTHY JAMES,                     :

               Plaintiff,     :

                          :

       -v-                  :

NEW YORK CITY HEALTH AND HOSPITALS CORP.,:
HARLEM HOSPITAL CENTER, CHERYL ISAACS,  :
Individually, and DONALD WAITERS, Individually,  :

                          :

            Defendants.    :

                          :

------------------------------------------------------------------ X

15 Civ. 6015 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This decision resolves a motion for partial summary judgment in this case involving allegations of workplace sexual harassment. Plaintiff Dorothy James brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et. seq.* ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et. seq.* ("NYCHRL"). She alleges that defendants—New York City Health and Hospitals Corp. ("NYC Health"), a not-for-profit corporation; Harlem Hospital Center ("HHC"), a public hospital run by NYC Health; Cheryl Isaacs, the Associate Director of NYC Health; and Donald Waiters, an employee of NYC Health—violated her rights under federal, state, and city law during her employment at NYC Health. James's claims include federal and city law claims of gender discrimination and retaliation, and a state law claim of assault and battery.

      Defendants now move for partial summary judgment. They argue that (1) James's NYCHRL claims are barred by the doctrine of collateral estoppel; (2) James has failed to establish a *prima facie* case of hostile work environment under either Title VII or NYCHRL; and

(3) James has failed to establish a *prima facie* case of retaliation under either Title VII or NYCHRL. For the following reasons, the Court denies defendants' motion.

## I.  Background[1]

### A.  Factual Background

#### 1.  The Parties

NYC Health is a public benefit corporation that operates as the public hospital system for the City of New York. JSF ¶ 1. This system includes "acute care hospitals, diagnostic and treatment centers, long term care facilities and numerous health community health clinics." *Id.*

HHC is an entity encompassing several health clinics, including the Drew Hamilton Clinic ("Drew Clinic"), included within NYC Health. *Id.* ¶ 2.

James was employed at HHC between approximately 2006 and January 27, 2016. *Id.* ¶ 7. James held the title of Principal Administrative Associate Level I, and was assigned to various

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to this motion, including: defendants' memorandum of law in support of the motion for partial summary judgment, Dkt. 41 ("Def. Br."); the declaration of Tanya N. Blocker in support of the motion for partial summary judgment, Dkt. 40 ("Blocker Decl."); plaintiff's memorandum of law in opposition to the motion for partial summary judgment, Dkt. 43 ("Pl. Br."); the declaration of Jessenia Maldonado in opposition to the motion for partial summary judgment, Dkt. 44 ("Maldonado Decl."); defendants' reply memorandum of law, Dkt. 47 ("Def. Reply Br."); the parties' joint statement of undisputed facts, Dkt. 37 ("JSF"); defendants' Local Rule 56.1 Statement, Dkt. 42 ("Def. 56.1"); and plaintiff's response to defendants Local Rule 56.1 Statement and counter-statement, Dkt. 45 ("Pl. 56.1"). Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

NYC Health clinics. *Id.* In February 2014, James was assigned to the Drew Clinic's Registration and Operation Department. *Id.* ¶ 10.

Waiters has been an NYC Health employee since 1992. *Id.* ¶ 11. In 2014, Waiters was working at the Drew Clinic with the title of Clerical Associate III in the Medical Records and Patient Registration and Operation Departments. *Id.*

Isaacs has been an NYC Health employee since 2010, with the title of Associate Director of the Harlem Hospital Network, which includes the Drew Clinic. *Id.* ¶ 12. In 2014, Isaacs was the supervisor of both Waiters and James. *Id.* ¶ 13.

## 2. Incidents of Alleged Sexual Harassment

James claims that Waiters sexually harassed her during their time working together at the Drew Clinic. Pl. 56.1 ¶¶ 46–51. In her deposition, she testified to Waiters's "very frequent" and "continuous" harassing behavior, Maldonado Decl., Ex. L ("James Depo.") at 34, which included making sexual innuendos, "consistently staring and glaring" at her, "following [her] around the clinic," and "trying to grab and touch" her, *id.* at 75–76. James testified to these examples of Waiters's conduct:

1. Around the time that James began working at the Drew Clinic, Waiters stated to James, "A woman would never have a problem with me, 'cause I'm well hung." *Id.* at 33.

2. In or around late February 2014, in the registration area at the Drew Clinic, Waiters stated to James, "A pussy has to be clean for me to eat it[.] I know you're clean." *Id.* at 30–31.

3. Between February and June, Waiters engaged in what James described as "touchy-feely" behavior, in which he would "[t]ry to embrace [James], try to come near [her], [and] rub up against [her]." *Id.* at 76.

4. Throughout their time working together, Waiters would frequently— approximately on a weekly basis—imitate sex acts by wagging his tongue and moving his head back and forth toward James, while making statements such as, "I know I can satisfy a woman." *Id.* at 38–39.

3

5. At some point during the time that Waiters and James worked together, Waiters began to unzip his zipper while asking James the color of her underwear. *Id.* at 74.

6. At some point during the time that Waiters and James worked together, Waiters said to James, referencing another female employee, "All you have to do is buy her a pack of cigs for her to give it up." *Id.* at 35.

7. At some point during the time that Waiters and James worked together, after James removed a blazer she was wearing, Waiters stated, "Oh, you could take it off. I'm not going to stare at you too much." *Id.* at 75.

James testified that she made clear to James that his comments and advances were unwanted. *Id.* ¶ 76. However, Waiters would engage in "mockery that he would do because [James] would not respond in kind or likeness to his sexual advances." *Id.* at 74. James claimed that Waiters persistently reacted negatively when she expressed discomfort with his behavior:

> When I didn't respond in kind and think that it was appropriate, or spoke on it and said it was inappropriate, then that's when you get the screaming. He would raise his voice. "I'm just playing." He'd get irate, irrational. He'd make little personal derogatory comments, more so to get a rise or raise out of anyone that was around.

*Id.* at 75. She testified to one incident in 2014 in which, after she rejected Waiters's advances and complained to others, Waiters publicly mocked James for her "weak eye." *Id.* at 83.

James testified that she had complained of Waiters' conduct repeatedly to Isaacs. Pl. 56.1 ¶¶ 52–54. In or around March 2014, she did so in person and in email. *Id.* at 54. Isaacs did not respond to her email, and Waiters's harassment continued. *Id.* at 55.

### 3. NYC Health Policies

NYC Health has a written policy that prohibits sexual harassment and outlines procedures for filing a sexual harassment complaint with its Office of Equal Employment Opportunity ("EEO"). JSF ¶ 3.

NYC Health also has a "Workplace Violence Prevention" policy that prohibits "occupational assaults, homicide, or attempt or threat (physical or verbal) to inflict physical injury occurring where a public employee performs any work-related duty in the course of his or her employment." *Id.* ¶ 4.

In addition, NYC Health's "Operating Procedures No. 20-2 Tardiness" requires employees to "report for work as scheduled both at the beginning of the work shift and upon return from the meal period." *Id.* ¶ 5. This policy defines excessive tardiness as "unexcused tardiness that results in an employee's late arrival on three (3) or more occasions in one month or in excess of 30 minutes in one month." *Id.* ¶ 5.

NYC Health's Labor Relations Department sets the penalties associated with violations of these tardiness and workplace violence policies and procedures. *Id.* ¶ 6. In deciding the particular penalty, the Labor Relations Department follows a "progressive discipline practice" and considers an employee's prior disciplinary history in addition to the conduct underlying the instant infraction. *Id.* ¶ 6.

### 4. Prior Disciplinary Histories

Until 2014, Waiters had no disciplinary history at HHC. Def. 56.1 at 5; Pl. 56.1 at 7.

As to James, between 2006 and 2013, five disciplinary charges were instituted against her in connection with violations of NYC Health policies relating to tardiness and insubordination. JSF ¶ 8. As of April 2013, James's most recent penalty for excessive lateness had been a 55-day suspension in July 2011. *Id.* ¶ 9. In connection with excessive lateness, James had also been issued a counseling session on June 28, 2012, and a warning notice on November 9, 2012. *Id.*

On or about April 26, 2013, disciplinary charges were instituted against James in connection with her excessive lateness—a total of one hour and 57 minutes—between December

10, 2012, and April 5, 2013. *Id.* ¶ 14. On July 1, 2013, NYC Health held a Step I hearing related to this April 2013 disciplinary charge. *Id.* ¶ 15. James's union representative Aaron Stewart attended the hearing. *Id.* James did not. *Id.*

On April 2, 2014, an NYC Health Labor Relations Associate, Carla Vasquez, sent an email to Stewart stating the following regarding a penalty for the April 2013 charge: "I'm willing to give Ms. James another chance of serving 60 days straight. If she does not want to sign waiver, unfortunately I will go for termination. Her last time, she got 55 days." *Id.* ¶ 16.

On or about April 6, 2014, James "complained" to Stewart regarding the offered 60-day penalty and told Stewart that NYC Health had threatened her with termination before her first excessive lateness suspension. *Id.* ¶ 17.

On April 8, 2014, Stewart sent James an email informing her that NYC Health had "offered a forty (40) day suspension with sixty (60) days on the books . . . due to progressive discipline" and indicating to her that NYC Health would "push for termination" if she did not accept this offer. *Id.* ¶ 18.

### 5. Physical Altercation at the Drew Clinic

On June 3, 2014, while James's April 2013 excessive lateness charge was still pending, James and Waiters had a physical altercation while working at the Drew Clinic. *Id.* ¶ 19.

In her deposition, James described the incident as follows: James was leaving the nursing area and walking to her work area when Waiters approached her and grabbed her. James Depo. at 87. Waiters "pulled [James] to him and . . . rubbed himself" against James's "upper torso" and the area "[f]rom [her] waist down." *Id.* at 88. Waiters then stated something to the effect of, "You don't come into this area without 'effin speaking to me first." *Id.* After James replied something to the effect of, "What's your problem? Get off of me," Waiters grabbed

6

James's arms and wrist, causing James's wristwatch to break. *Id.* at 87, 90. As James backed away from Waiters, Waiters grabbed James's legs and knees and "flipped" her backwards "over the garbage receptacle," causing her to fall "against the wall." *Id.* at 87, 90. Other employees in the area "jumped up" to ask if James was all right because "the noise was so loud." *Id.* Waiters then "tried to sail out of the area like nothing happened," and James "left the area and . . . went and called the police." *Id.* at 88.

In his deposition, Waiters testified to a starkly different description of the incident. He claimed that he and James were sitting in a "huddle" with other colleagues when "all of a sudden she hit [him] on [his] hand." Blocker Decl., Ex. I ("Waiters Depo") at 60. Waiters claimed that he and James then began to "hit[]" and "push" each other: "[Y]ou know, it's going back and forth hitting her on her hand, back and forth hitting each other on the hand, like a push, most like a push." *Id.* Waiters testified that James "then . . . just went irate," stated, "you're going to get my motherfucking watch fixed," and "started cursing at [him]." *Id.* Waiters testified that he was "puzzled" by this, and that he "hadn't said anything to her." *Id.* After other colleagues made statements such as "be professional" and "walk away," Waiters left the area and went back to his office. *Id.* at 60–61. Fifteen or 20 minutes later, police officers knocked on Waiters's door and informed him that James had claimed that Waiters had assaulted her. *Id.* at 61.

That same day, both James and Waiters were suspended without pay pending an investigation. Disciplinary charges were later instituted against both. JSF ¶ 21.

### 6. Penalties Imposed

As a penalty for the June 3, 2014, incident, Waiters served a suspension of approximately 21 days, returning to work at the Drew Clinic on June 23, 2014. *Id.* ¶¶ 23–24. NYC Health held a Step 1(A) Hearing for Waiters on June 23, 2014. *Id.* ¶ 22. Waiters accepted NYC Health's

recommended penalty of "seven (7) days and four (4) hours [of the 21 days suspension] deemed time served [and] seven (7) days" of pay restored. *Id.* ¶ 23.

As a penalty for the June 3, 2014, incident, James served an unpaid suspension of approximately 30 days, followed by a suspension with pay that began on or about July 2014. The suspension ended—after James's challenge, recounted below, had run its course—with her termination on January 27, 2016. *Id.* ¶ 25. Specifically, on July 14, 2014, amended charges and specification were issued against James, adding a workplace violence charge to her pending April 2013 excessive lateness charge. *Id.* ¶ 26. On August 26, 2014, NYC Health held a Step 1(A) hearing for James regarding the June 3, 2014, incident as well as the excessive lateness charge. *Id.* ¶ 27. On December 3, 2014, NYC Health issued a recommendation to terminate James's employment. *Id.* ¶ 28. Later, NYC Health amended this recommendation and offered James a penalty of 60 days unpaid suspension. *Id.* ¶ 29. James rejected the recommendation. *Id.* She accepted responsibility for the excessive lateness charges but denied violating NYC Health's workplace violence policy in connection with the June 3, 2014, incident. *Id.* ¶ 30.

In her deposition, NYC Health labor relations associate Vasquez testified that James's initial 30-day unpaid suspension was based solely on the June 3, 2014, incident:

| [QUESTION]: | Why was [James] suspended for 30 days without pay? . . . |
|---|---|
| [ANSWER]: | The incident that occurred with Donald Waiters. |
| [QUESTION]: | Did it only have to do with the incident that happened with Donald Waiters? |
| [ANSWER]: | Yes. |

Maldonado Decl., Ex. O ("Vasquez Depo.") at 43.

### 7. Office of Administrative Trials and Hearings ("OATH") Disciplinary Hearing

On October 6, 2015, James's excessive lateness and workplace violence charges were litigated at an OATH disciplinary hearing before Administrative Law Judge ("ALJ") Kara J. Miller. Def. 56.1 ¶ 31. "OATH is a City agency that, *inter alia*, conducts hearings to resolve disciplinary charges brought against City civil service employees." *Krasner v. City of New York*, No. 11 Civ. 2048 (PGG), 2013 WL 5338558, at *1 (S.D.N.Y. Sept. 23, 2013), *aff'd*, 580 F. App'x 1 (2d Cir. 2014). The transcript of the OATH hearing, submitted by James in opposition to defendants' summary judgment motion, reflects that James was represented there by her union representative, Joseph Diesso, and that attorney Angela Chilaka represented her employer. Maldonado Decl., Ex. B. The transcript also reflects that Chilaka, in her opening statement, stated that James had "initiate[d] a pushing and shoving match with Waiters." *Id.* at 7. Diesso waived James's right to give an opening statement. *Id.* at 7–8.

At the OATH proceeding, James testified that the June 3, 2014, incident reflected an escalation of Waiters' prior sexual harassment of her. Pl. 65.1 ¶ 37. James testified that Waiters had previously behaved inappropriately towards her and had sexually harassed her beginning in late February 2014. *Id.* ¶ 32. As one example, she testified that Waiters had once approached her and attempted to open his zipper in front of her. *Id.* ¶ 34. She further testified that, around March 2014, she complained to Waiters and then Isaacs about James's sexual comments, "jokes," and advances. *Id.* ¶ 33. She testified that she reported Waiters' conduct to Isaacs both orally and by email (which she did not produce for OATH) in March 2014 and in person in April 2014. *Id.* ¶¶ 35–38.

On or about January 4, 2016, the ALJ issued a report and recommendation upholding HHC's decision to terminate James. *Id.* ¶ 39. In sustaining the workplace violence charge against her, the ALJ stated that "there was no support for [James's] claim of sexual harassment"

and that James had "followed the incident by making a baseless allegation of sexual assault and wildly exaggerated the amount of force used by Mr. Waiters." *Id.* ¶ 40.

On January 27, 2016, HHC adopted the ALJ's report and recommendation and terminated James. *Id.* ¶ 41. James claims that, in or around February 2016, she attempted to appeal the report and recommendation and "was informed by OATH that the decision could not be appealed." Pl. 56.1 ¶ 68.

### B. Procedural History

On June 24, 2014, James filed a complaint of gender discrimination (sexual harassment) and retaliation against NYC Health with the New York State Division of Human Rights. JSF ¶ 31.

On July 31, 2015, James filed the Complaint in this case. Dkt. 1 ("Compl."). On October 19, 2015, defendants filed an answer. Dkt. 12.

On October 20, 2015, this action was automatically referred to mediation. Dkt. 13. On April 14, 2016, the mediator reported that mediation had been unsuccessful. Dkt. 17.

On January 17, 2017, defendants filed this motion for partial summary judgment, Dkt. 38, and a supporting memorandum of law, Dkt. 41, and declaration of Tanya N. Blocker, Dkt. 40. On February 13, 2017, James filed a memorandum of law in opposition, Dkt. 43, as well as a supporting declaration of Jessenia Maldonado, Dkt. 44. On February 27, 2017, defendants filed a reply in further support of their motion. Dkt. 47.

On June 12, 2017, the Court held argument on the pending motion.

## II. Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

## III. Discussion

Defendants seek summary judgment on James's Title VII and NYCHRL claims of hostile work environment and retaliation. They make three arguments: first, that the doctrine of collateral estoppel bars James's NYCHRL claims; second, that, as a matter of law, the evidence

cannot support claims of a hostile work environment under either statute; and third, that, as a matter of law, the evidence cannot support claims of retaliation under either statute. The Court addresses these arguments in turn.

### A.    Collateral Estoppel

Defendants argue that James's NYCHRL claims are barred by collateral estoppel because the factual issues underlying these claims were litigated in the OATH proceeding.

"The doctrine of collateral estoppel prevents a plaintiff from relitigating in a subsequent proceeding an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003) (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002)). The prior proceeding need not necessarily be judicial in nature; in some contexts, where an administrative agency "employ[s] procedures similar to those used in a court of law," *Payton v. Metro-N. Commuter R. Co.*, No. 93 Civ. 4840 (SAS), 1995 WL 640591, at *2 (S.D.N.Y. Oct. 31, 1995), "a quasi-judicial administrative action" may result in "findings . . . entitled to preclusive effect." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 308 (2d Cir. 2005); *see Bonheur v. Dresdner Bank, A.G.*, No. 85 Civ. 4925 (GLG), 1986 WL 4702, at *4 (S.D.N.Y. Apr. 14, 1986) ("It is well settled that the doctrines of *res judicata* and collateral estoppel, if applicable, give conclusive effect to the quasi-judicial determinations of administrative agencies."); *see also Krasner*, 2013 WL 5338558, at *11 ("[W]hen a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.") (internal quotation marks omitted).

Collateral estoppel, however, is permitted only if "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997) (internal quotation marks omitted). Moreover, "[t]hese four factors are required but not sufficient." *Bear, Stearns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005). The Court must also "satisfy itself that application of the doctrine is fair." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)). Further, under New York law, for collateral estoppel to apply, the plaintiff must be given "a full and fair opportunity to contest the prior decision." *Bristol v. Nassau Cty.*, No. 16-1686-PR, 2017 WL 1194815, at *2 (2d Cir. Mar. 30, 2017) (internal quotation marks omitted); *accord Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007).

The Court must exercise caution in determining whether collateral estoppel applies following a quasi-judicial proceeding. "[S]ince administrative agencies are normally charged with making determinations based on unique, and often times complex, statutes and regulations which apply specifically to them, care must be taken in identifying the precise issue necessarily decided in the first proceeding and comparing it to the issue involved in the second proceeding." *Pelzer v. Transel Elevator & Elec. Inc.*, 41 A.D.3d 379, 380 (2007) (internal quotation marks omitted). Moreover, as to whether a party has had a full and fair litigation opportunity at a quasi-judicial proceeding, the court must conduct "a practical inquiry into the realities of litigation," examining factors including "the competence and experience of counsel." *Bd. of Educ. of Manhasset Union Free Sch. Dist. v. New York State Human Rights Appeal Bd.*, 106 A.D.2d 364, 365–66 (1984) (internal quotation marks omitted).

"Issue preclusion will apply only if it is quite clear that the elements have been met so that a party is not precluded from obtaining at least one full hearing on his or her claim." *Latino Officers Ass'n v. City of New York*, 253 F. Supp. 2d 771, 783 (S.D.N.Y. 2003) (internal quotation marks omitted). "The burden of showing that the issues are identical and necessarily were decided in the prior action rests with the party seeking to apply issue preclusion while the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with the party opposing its application." *Id.*

Here, the Court cannot find that, as a matter of law, collateral estoppel bars James's NYCHRL claims, because the Court is not persuaded that the OATH proceeding gave James with a full and fair opportunity to litigate the central issues here. Unlike defendants, James was not represented by counsel at that proceeding. She was represented by a union representative who, unimpressively, began the proceeding by waiving James's right to an opening statement. Pl. 56.1 ¶ 62. *See Bd. of Educ. of Manhasset Union Free Sch. Dist.*, 106 A.D.2d at 366 (declining to apply collateral estoppel where "neither side was represented by counsel" in a quasi-judicial proceeding and "[t]he lack of counsel was particularly damaging to complainant, who was not highly educated"); *cf. Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 580 (S.D.N.Y. 2011) (finding there could be "no real dispute that [the plaintiff] had a full and fair opportunity to litigate the issues raised in connection with the instant discrimination claims" where, at two hearings, which cumulatively lasted 25 days, the plaintiff "was represented by counsel, had the opportunity to introduce evidence and call witnesses, cross examine witnesses, and make arguments"); *Bonheur*, 1986 WL 4702, at *5 (applying collateral estoppel following a quasi-judicial proceeding where "the plaintiff was represented by competent, experienced counsel" before an ALJ).

And the hearing centered on the disciplinary charges brought against James, which turned on the June 3, 2014 altercation. Particularly without the guidance of counsel, James may not have appreciated that the OATH proceeding could have a preclusive effect on a future discrimination claim based on a hostile environment theory. And while her claim of a hostile work environment was a component of her defense to the charges that she instigated the incident, James's incentive to offer full evidence of—and her practical ability to establish—that hostile work environment appears materially short of that here.

It is, finally, unclear that, to the extent that the ALJ's decision is read to opine whether— apart from the June 3, 2014, altercation—James was *ever* subjected to sexual harassment by Waiters, the ALJ's assessment of that point was "necessary to support a valid and final judgment on the merits." *Smith*, 808 F. Supp. 2d at 581. The ALJ could have found that James had violated her employer's workplace violence policy in connection with the altercation with Waiters, regardless of whether she had ever been subjected to sexual harassment by Waiters in the past.[2]

Accordingly, the Court denies defendants' motion for summary judgment on James's NYCHRL claims on the theory of collateral estoppel.

_____

[2] Even if the above factors counseling against applying collateral estoppel were not present, a factual dispute would—unless and until resolved in defendants' favor—prevent the Court from finding preclusion based on the OATH proceeding. James has sworn that, despite attempting to appeal the OATH decision on or around February 2016, she contacted OATH and was informed that the ALJ's decision could not be appealed. *See* Pl. 56.1 ¶ 68. Defendants dispute this claim, terming it "serve-serving," and blaming James for "fail[ing] to avail herself of" appeal rights afforded her by NYC Health's rules and regulations. Def. Rep. Br. at 8. There is thus a factual dispute whether James sought to appeal the OATH decision but was improperly inhibited from doing so; if so, collateral estoppel could not apply. Because, on summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of" the party against whom summary judgment is sought, *Johnson*, 680 F.3d at 236, the Court could not find, unless this factual dispute were first resolved against James, that as a matter of law she was given a full and fair opportunity to appeal the ALJ's determination.

### B. Hostile Work Environment

Defendants argue that James has failed to adduce sufficient evidence to maintain a hostile work environment claim under Title VII or NYCHRL. With respect to this claim, James argues that Waiters's actions were directed at her on the basis of her gender and, viewed as a whole, created a hostile work environment under Title VII and NYCHRL. Defendants' motion requires the Court to inquire, first, whether a reasonable jury could find an objectively hostile work environment based on Waiters's conduct; and, second, whether that conduct may be imputed to NYC Health and HHC.

### 1. Title VII

#### a. Objectively Hostile Work Environment

Under Title VII, a federal claim of hostile work environment against an employer requires a plaintiff to demonstrate "that the discriminatory harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," that "the hostile conduct occurred because of a protected characteristic," and that "a specific basis exists for imputing the objectionable conduct to the employer." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (internal quotation marks omitted).

In assessing whether a plaintiff has met her burden to demonstrate a hostile work environment, courts evaluate "the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (alteration and internal quotation marks omitted). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v.*

*Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*

Defendants argue that Waiters's alleged conduct was not sufficiently severe or pervasive as a matter of law. *See* Def. Br. at 12 (claiming conduct "lacks any semblance of concreteness, vulgarity or even obscenity"). That evidence, however, is sufficient to meet James' burden. James testified to numerous instances of consistent harassing behavior. As noted, James testified that Waiters—"frequent[ly]" and "continuous[ly]," for a period of months—followed her around their mutual workplace making sexual innuendos and attempting to grab her, touch her, and rub up against her. *See* James Depo. 75–76. She testified that—weekly—Waiters would imitate sex acts while moving his head towards James and making crude comments about his own sexual prowess. *Id.* at 38–39. James testified to specific statements made to her by Waiters, including: regarding Waiters's own sexual activity and genitals, *see id.* at 38–39 ("I know I can satisfy a woman."); *id.* at 33 ("A woman would never have a problem with me, 'cause I'm well hung."); statements regarding James's genitals and sexual activity with James, *see id.* at 30–31 ("A pussy has to be clean for me to eat it[.] I know you're clean."); and regarding sexual activity with another female employee, *see id.* at 35 ("All you have to do is buy her a pack of cigs for her to give it up."). James also recounted sexually aggressive incidents in which Waiters began to unzip his pants in her face while asking her the color of her underwear, and in which Waiters encouraged her to keep a layer of clothing off while telling her he would not stare at her "too much." *Id.* at 74–57. And, most dramatically, James testified that Waiters attacked her in the workplace by attempting to rub up against her, and then, when she rebuffed his advances, by physically assaulting her by grabbing her and "flipping" her over a garbage bin. *Id.* at 87–90.

17

This conduct is sufficiently severe and pervasive to satisfy Title VII. *See Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 283 (S.D.N.Y. 2012) (incident in which supervisor put hands on plaintiff's neck, shook her, and told her she was in danger of being raped, "standing alone, arguably suffices to defeat defendant's motion, and viewed in combination with the supervisor's other actions as recounted by [plaintiff], is sufficiently severe to constitute a work environment that a jury could reasonably find hostile or abusive" (internal quotation marks omitted)); *see also McDonald v. B.E. Windows Corp.*, No. 01 Civ. 6707 (RLC), 2003 WL 21012045, at *3 (S.D.N.Y. May 5, 2003) (denying summary judgment where evidence showed "a combination of vulgar sexual advances, clear and blatant physical threats, attempts to intimidate plaintiff through physical approaches, catcalls, and staring, in such a continuous and concerted manner that a reasonable juror could find an objectively hostile work environment"); *cf. McCabe v. Quiet Man, Inc.*, No. 01 Civ. 5055 (DAB), 2006 WL 1379588, at *7 (S.D.N.Y. May 19, 2006) (denying summary judgment on hostile work environment claim where employee claimed that his supervisor, *inter alia*, made crude comments and jokes, distributed to employees a magazine article about oral sex, and told the employee that he needed or wanted a "blow job").

Defendants characterize the conduct described above as "too ambiguous in meaning and content to meet the objective standard for an actionable hostile work environment claim." Def. Br. at 12. But while defendants are at liberty to venture that argument at trial, a finder of fact could—easily—reject it. A finder of fact, crediting James, could find little ambiguity in conduct that included an actual assault as well as continuous staring, frequent simulation of sex acts, and repeated sexually charged statements such as those referencing oral sex and opining on whether James's genitals are "clean."

A finder of fact could also reject defendants' claim, *see* Def. Br. at 12, that Waiters's behavior was not gender-specific. James testified that Waiters (a) specifically referred to female body parts and made sexual comments regarding female employees, (b) repeatedly referred to how "a woman" would view his sexual abilities, and (c) repeatedly attempted to rub himself against James's torso and lower body. *See Parrish v. Sollecito*, 249 F. Supp. 2d 342, 349 (S.D.N.Y. 2003) ("'[G]rabbing, poking, rubbing or mouthing areas of the body linked to sexuality . . . is inescapably because of sex.'" (quoting *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1066 (9th Cir. 2002) (internal quotation marks and alteration omitted)).

Accordingly, James has presented evidence sufficient to support a jury finding that Waiters's conduct was directed at James on the basis of her gender and created a hostile work environment in violation of Title VII.

### b.    Imputation to NYC Health and HHC

The Court next inquires whether Waiters's conduct may be imputed to NYC Health and HHC.

"Under Title VII, individuals may not be held personally liable." *Philip v. Gtech Corp.*, No. 14 Civ. 9261 (PAE), 2016 WL 3959729, at *12 (S.D.N.Y. July 20, 2016) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313-14 (2d Cir. 1995)). Accordingly, James brings her Title VII hostile work environment claim against NYC Health and HHC, not Waiters. For such claims to proceed, "a specific basis [must] exist[] for imputing the objectionable conduct to [her] employer." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (citations omitted).

The standards for assessing vicarious liability differ depending on the status of the alleged harasser. When a "supervisor" does the harassing, the conduct is attributable to the employer if (1) the supervisor takes a tangible employment action, or (2) the employer is unable

to establish an affirmative defense by showing that it exercised reasonable care to prevent and correct any harassing behavior and that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided. *See Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2442 (2013) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 525 U.S. 775 (1998)). In contrast, where a "coworker harasses the plaintiff," an employer can be "directly liable for [that] employee's unlawful harassment if the employer was negligent with respect to the offensive behavior." *Id.* at 2441. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (quoting *Perry*, 115 F.3d at 149); *accord Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009). The latter test applies here, where Waiters was James's co-worker, not her supervisor.

The evidence here permits imputing Waiters's conduct to NYC Health and HHC, based on James's "complaints to [to her supervisor] about [her co-worker's] conduct, and [her supervisor's] failure to act." *Brown v. City of N.Y.*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *12 (S.D.N.Y. July 19, 2013). "Despite offering a reasonable avenue of complaint to plaintiff, employer defendants can still be held liable if plaintiff can show that they knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch*, 588 F.3d at 763. "This standard requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Id.* The Second Circuit has further explained that, with respect to imputing the knowledge of employees to an employer,

> [a]n official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate. That will be the case when a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, or b) the official is charged with a duty to act on the knowledge and stop the harassment, or c) the official is charged with a duty to inform the company of the harassment.

*Id.* (quoting *Torres v. Pisano*, 116 F.3d 625, 63637 (2d Cir.1997)).

Here, James testified that she repeatedly complained to Isaacs, the Associate Director of HHC, about the harassment in person and in email. Pl. 56.1 ¶¶ 52–54. James further testified that Isaacs did nothing and the harassment continued. *Id.* at 55. Inasmuch as Isaacs was a high-level employee who was the direct supervisor of both Waiters and James, Isaacs's knowledge of Waiters's inappropriate workplace behavior is properly imputed to NYC Health and HHC. "A reasonable jury could therefore find that [NYC Health and HHC's] failure to remove [Waiters] from the workplace, in light of that knowledge, was unreasonable." *Brown*, 2013 WL 3789091, at *13.

Accordingly, the Court denies defendants' motion for summary judgment on James's Title VII hostile work environment claim against NYC Health and HHC.

### 2. NYCHRL

#### a. Objectively Hostile Work Environment

The standard for liability under NYCHRL is more permissive than the standard for liability under Title VII, in that offensive conduct need not be "severe or pervasive"; rather, it need only amount to "unwanted gender-based conduct." *Anderson v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38 (1st Dep't 2009); *accord Anderson v. Davis, Polk & Wardwell, LLP*, No. 10 Civ. 9338 (NRB), 2013 WL 1809443, at *2 (S.D.N.Y. Apr. 29, 2013). For the reasons discussed above, James has adduced evidence sufficient for a reasonable jury to find that she suffered a hostile work environment under city law. *See Brown*, 2013 WL 3789091, at *18 ("[B]ecause a

reasonably jury could find a hostile work environment under federal law, it could also find such an environment under . . . city law.").

### b. Imputation to NYC Health and HHC

The Court next considers whether NYC Health and HHC can be held liable for Waiters's misconduct under the NYCHRL.

The NYCHRL imposes liability on an employer in three instances, including "where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action.'" *Zakrzewska v. New School,* 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)). "[A]n employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or super[vi]sory responsibility." N.Y.C. Admin. Code § 8-107(13)(b)(2).

Here, for the reasons discussed above with respect to Title VII, a reasonable jury could impute liability to NYC Health and HHC. Isaacs was the supervisor for both James and Waiters. James testified that she repeatedly told Isaacs about Waiters's conduct. In response, defendants did not remove Waiters from the workplace or take any other action whatsoever. *See Brown,* 2013 WL 3789091, at *18 (denying summary judgment on NYCHRL claim where plaintiff testified that she repeatedly complained to a supervisor who did nothing).

The Court therefore denies defendants' motion for summary judgment on James's NYCHRL hostile work environment claim against NYC Health and HHC.

### C. Retaliation

Defendants also seek summary judgment on James's retaliation claims under both Title VII and NYCHRL. The Court first reviews the statutory frameworks, and then applies them to the evidence adduced.

### 1. Title VII

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The statute thus "prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).

Title VII's anti-retaliation provision specifically "seeks to further [the Act's] goal of a workplace free from discrimination on the basis of . . . gender." *Id.* The provision's primary objective is to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

The Supreme Court has recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C.] § 2000e2(m) [for status-based employment discrimination claims]. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

In adjudicating retaliation claims, courts follow the "familiar burden-shifting framework" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff meets her initial burden of making out a *prima facie* case, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If the employer meets that burden of production, "'the *McDonnell Douglas* framework . . . disappear[s] and the sole remaining issue . . . [is] discrimination *vel non*.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 14243 (2000)). The plaintiff must then prove the ultimate issues without any "benefit of . . . intermediate burdens and presumptions." *Id.*; *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The plaintiff may satisfy this burden by showing "pretext," *i.e.*, that the employer's proffered reason was false. *See, e.g., Reeves*, 530 U.S. at 143, 147. However, "if the record conclusively reveal[s] [a] nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact [as to pretext] and there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred," then the employer is entitled to judgment as a matter of law. *Id.* at 148; *see also Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125–26 (2d Cir. 2008) (finding that "overwhelming evidence" of legitimate reason for dismissal warranted judgment as a matter of law).

To prove a *prima facie* case of retaliation, a plaintiff must establish that: (1) she participated in a protected activity; (2) participation in the protected activity was known to the employer; (3) the employer thereafter subjected her to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The burden of proof

at the *prima facie* stage has been characterized as "de minimis." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

For the reasons that follow, the Court finds that James has adduced sufficient evidence to establish the four prongs of her *prima facie* case and to support a finding that the legitimate, non-retaliatory justification proffered by defendants was pretextual.

### a.    Protected Activity

An employee engages in a protected activity under Title VII when she "has opposed any particular practice made an unlawful employment practice by this subchapter, or because [she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *see Hicks*, 593 F.3d at 166; *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).

Here, James has presented evidence—in the form of her own testimony—that she engaged in a protected activity by complaining repeatedly to Isaacs regarding Waiters' conduct. *See id.* at 270 ("[P]laintiff has proffered evidence that he engaged in protected activity by making two complaints to his supervisor . . . regarding the purportedly offensive conduct of his coworkers."). Defendants stress that James has not come forward with written—or other—evidence corroborating her testimony about these complaints, and that Isaacs testified in her deposition that she never received any complaints from James. *See* Blocker Decl., Ex P ("Isaacs Depo.") at 33. While a finder of fact could certainly reject James's version of events, it could also find for James based on her testimony. Whether James complained of Waiters' conduct thus presents a factual dispute that is not properly resolved by the Court on a summary judgment motion. Crediting the evidence supporting the non-moving party, *see Holcomb*, 521 F.3d at 132,

the Court finds that James has presented sufficient evidence of a protected activity to meet this prong of the *prima facie* standard.

### b. Known to Employer

An employer is aware of a protected activity when it "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011); *see Campbell v. Home Depot U.S.A., Inc.*, No. 03 Civ. 1421 (KMK) (HBP), 2006 WL 839001, at *11 (S.D.N.Y. March 30, 2006) ("Whether or not the individual employees who decided to terminate [the plaintiff] knew of her complaint is immaterial to resolving the knowledge requirement"). "'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.'" *Papelino*, 633 F.3d at 92 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000)).

James's complaints to Isaacs satisfy the knowledge prong of her *prima facie* case. *See Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 270 (S.D.N.Y. 2007) (complaints to supervisor "clearly satisfy" the knowledge aspect of the *prima facie* standard); *see also Reed v. AW. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal complaints regarding co-workers' behavior, including complaint to one individual officer, sufficed to establish employer awareness prong of *prima facie* standard).

### c. Adverse Employment Action

A plaintiff sustains an adverse employment action if she endures a "materially adverse change" in the terms and conditions of employment. *See Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Employer actions "are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern*, 548 U.S. at 57). Whether an employer's action could dissuade a reasonable employee, situated similarly to the plaintiff, from making a charge of discrimination is an objective determination. *See Tepperwien*, 663 F.3d at 567. "Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Id.* at 568. However, to be "materially adverse," a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation marks omitted). "'[P]etty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims." *Millea v. Metro–North R.R.*, 658 F.3d 154, 165 (2d Cir. 2011) (quoting *Burlington Northern*, 548 U.S. at 68). Actions "sufficiently disadvantageous" so as to constitute an adverse employment action "include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (citation and internal quotation marks omitted).

Here, it is undisputed that James was suspended and then terminated after the physical altercation with Waiters. JSF ¶ 25. That suspension and termination are quintessential adverse employment actions. The Court does not understand defendants to argue otherwise.

### d.    Causation

"Causation of an adverse employment action traceable to a protected activity may be established 'either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 587 (S.D.N.Y. 2012) (quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)), *aff'd*, 2013 WL 1943276 (2d Cir. May 13, 2013). "Title VII retaliation claims must be proved according to the traditional principles of but-for retaliation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful act or actions of the employer." *Nassar*, 133 S. Ct. at 2533. In addressing this issue, "the court's role . . . is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Commis.*, 834 F.2d 54, 58 (2d Cir. 1987)).

Defendants argue that James has failed to establish the fourth prong of her *prima facie* case, on the grounds that the evidence does not support a causal relationship between any protected activity and her suspension and termination.

James does not point to any direct evidence of retaliatory animus. She therefore must establish causation indirectly, either by the temporal proximity between the adverse act and the protected activity or by other circumstantial evidence. Here, James notes, as to temporal proximity, that her complaints to Isaacs were followed sufficiently closely by the disciplinary penalties she received following her altercation with Waiters, and, as to other circumstantial

evidence, that the disciplinary penalties she received substantially exceeded those received by Waiters.

Although the question is a close one, the Court holds that James's evidence, particularly that of temporal proximity, is sufficient to establish the causation prong of her *prima facie* case. "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor*, 609 F.3d at 552. To be sure, temporal proximity is often construed strictly: "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (although no bright-line rule, plaintiff who relies on "mere temporal proximity between protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case" must plead that events were "very close" in time).

Here, James claims to have continued reporting Waiters's misconduct to Isaacs as late as May 2014, a mere month before the altercation and James's initial suspension. James Depo. at 78. And the harsher penalty imposed on James relative to that imposed on co-worker Waiters following the same altercation can be argued as support for the claim of retaliation. Crediting James's testimony, Waiters attacked her and yet received a lesser punishment than she did, despite her being, ostensibly, the innocent in the encounter. Notably, Waiters himself admitted "hitting" and "push[ing]" James, and claimed that James did little more than the same. Waiters Depo. at 60. A reasonable jury could view the disparate punishments as supporting an inference

of discrimination. Accordingly, the Court holds, James has met her burden—there is sufficient evidence of causation for the retaliation claim to go forward.

### e. Pretext of Legitimate, Non-Retaliatory Justification

Under the *McDonnell Douglas* framework, establishment of a *prima facie* case will not suffice to survive a motion for summary judgment where defendants have met their burden to offer a non-retaliatory, legitimate justification for the act claimed to be retaliatory. Defendants have do so here. They argue that James was disciplined not because of a retaliatory animus but because she, too, "violat[ed] [NYC Health's] workplace violence policy." Def. Rep. Br. at 13. And, defendants argue, the different penalties imposed on Waiters and James can be justified on neutral grounds, including the participants' different disciplinary histories, *id.* at 14, and the fact that other charges (for excessive tardiness, predating the altercation) were pending against James at the time the penalties were imposed, Def. Br. at 20–21.

Defendants' neutral justification could certainly be credited by a reasonable finder of fact. On defendants' motion, however, the issue is whether a reasonable jury could alternatively find this justification pretextual. The Court's judgment is that it could. A reasonable jury could find that the difference between the disciplinary histories of Waiters and James could not have justified the significant disparity in their punishments, particularly given that (1) on one view of the altercation, Waiters was the instigator of a workplace assault and by far the more culpable participant, and (2) James's prior disciplinary issues primarily involved tardiness, not workplace violence. A jury could also find defendants' justification pretextual given the testimony of NYC Health labor relations associate Vasquez that James's suspension was based exclusively on the physical altercation, not on a combination of the altercation and James's tardiness. Maldonado Decl., Ex. O ("Vasquez Depo.") at 43.

Ultimately, the Court concludes that there is a triable issue of fact as to this issue. James's Title VII retaliation claim survives summary judgment.

### 2. NYCHRL

Section 107(7) of the NYCHRL makes it unlawful for:

> any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8–115 of this chapter.

N.Y.C. Admin. Code § 8-107(7). Liability for retaliation under the NYCHRL is broader than under the companion federal and state statutes. "Under the NYCHRL, a plaintiff need establish only that his protected activity was a motivating factor behind the defendant's retaliatory action—not, as under Title VII, that it was a but-for cause." *Philip*, 2016 WL 3959729, at *11. However, a plaintiff claiming retaliation under the NYCHRL must still show that her employer was aware that she engaged in a protected activity, and that there was a causal connection between the protected activity and the employer's subsequent action. *Pilgrim*, 599 F. Supp. 2d at 469.

For the same reasons discussed above with respect to James's Title VII retaliation claim, the record supports—though by no means compels—a finding that James engaged in a protected activity by repeatedly complaining to Isaacs about Waiters's behavior and that there was a causal connection between these complaints and the disciplinary penalties later imposed on James. Thus, a reasonable juror could find that defendants retaliated against James in violation of the

NYCHRL. The Court accordingly denies defendants' motion for summary judgment on that claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is denied. The Clerk of Court is respectfully directed to close the motion pending at Dkt. 38.

The Court directs counsel to meet and confer in person within two weeks of this decision to discuss resolving this matter, and thereafter promptly to submit a letter to the Court reporting on whether the case has settled. If it has not, the Court will set a prompt schedule for the submission of a joint pretrial order and other pretrial submissions and will, thereafter, set a trial date.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 6, 2017
      New York, New York